UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JAMES H. MONTICELLI, as Administrator of
the Estate of JAMES W. MONTICELLI,

                              Plaintiff,

       v.                                        5:12-cv-1274

WAL-MART STORES EAST, LP, IQ
PRODUCTS COMPANY,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

       Plaintiff James H. Monticelli ("Plaintiff"), as administrator of the Estate of James W.

Monticelli ("Monticelli"), commenced the instant action seeking to recover damages for

injuries to, and the resulting death of, Monticelli arising out of his inhalation of a product

made by Defendant IQ Products Company and sold by Defendant Wal-Mart Stores East, LP.

Presently before the Court are Defendants' motions for summary judgment pursuant to Fed.

R. Civ. P. 56 seeking dismissal of the Complaint in its entirety.  Plaintiff opposes the motion.

**I.      FACTS**

       According to the First Amended Complaint, on numerous occasions prior to

September 28, 2010, Monticelli purchased large quantities of canned dust remover with the

brand name "CleanSafe" from Defendant Wal-Mart Stores, Inc. ("Wal-Mart").  CleanSafe is

manufactured by Defendant IQ Products Company ("IQ").  Monticelli was seriously injured on September 28, 2010, resulting in his death.[1]

According to Monticelli's roommate, Mr. Prindle, at approximately 4:30 p.m. on September 28, 2010, he observed Monticelli inhaling aerosol dust remover in his bedroom. Around 9:00 p.m., Prindle delivered a piece of pizza to Monticelli.  Thereafter, Prindle heard Monticelli mumbling and talking to himself.  At approximately 9:45 p.m., Prindle checked on Plaintiff and found him face up on his bed, eyes open, with blue lips.  Prindle shook Monticelli, who was non-responsive and did not appear to be breathing.  Prindle called 911.

The Onondaga County Sheriff's Office investigated Monticelli's death.  The investigation noted, among other things, the presence of aerosol cans in Monticelli's room. An autopsy conducted by the Onondaga County Medical Examiner's Office listed the cause of death as "Mixed Cocaine and 1,1 difluoroethane intoxication."  A postmortem blood toxicology report showed that Monticelli had 0.25 mg/L of blood cocaine; 0.10 mg/L of benzoylecgonine, a cocaine metabolite, and 230 mg/L of 1,1 difluoroethane in his system.

Defendant hired an expert, Dr. Alphone Poklis, who opined that the levels of blood cocaine and cocaine metabolite were indicative of recent cocaine use that occurred within the time frame in which Pridle stated that Monticelli was inhaling the aerosol.  Specifically, Dr. Poklis opined that Monticelli was using cocaine approximately 25 to 40 minutes prior to death.  Dr. Poklis stated that Monticelli's death was indicative of "Sudden Sniffing Death Syndrome" that occurred within the same time frame in which Monticelli was using cocaine. Poklis further concluded that the presence of cocaine in Monticelli's blood while he was

---

[1] Although the Amended Complaint does not explicitly state how Monticelli was injured in connection with the use of CleanSafe, the undisputed facts demonstrate that Monticelli inhaled it, apparently for its psychoactive effects.

"huffing" significantly contributed to his death and that the combined presence of cocaine and 1,1 difluoroethane in Monticelli's blood may act synergistically, increasing the probability of a fatal arrhythmia.

Plaintiff's expert, Dr. Lyle Hayes, largely agreed with Dr. Poklis.  Hayes issued a report stating that "[t]he levels of cocaine and its metabolite [in Monticelli's blood] are similar to levels found in cases of recent medical and recreational use."  Hayes further opined that the fact that more cocaine was present than cocaine metabolite suggested "very recent" cocaine use, in the range of ½ to 1 hour prior to death.  Hayes agreed with Poklis that the level of 1,1 difluoroethane in Monticelli's blood is within the range of known deaths from sudden sniffing death syndrome.  Hayes further stated in his report that the level of cocaine in Monticelli's blood was not of the levels typically associated with overdose fatality and that fatal overdoses of cocaine are rare.  Hayes then concludes that "[t]he fact that the cocaine level is not in the acute toxic range makes it difficult to attribute cause of death to cocaine overdose in the presence of other potentially fatal events or toxins.  In the absence of clearly toxic levels of cocaine, i.e. much higher than those found here, cocaine is not certain to be a contributing factor in this death, in my opinion.  This is the case here, since a fatal level of 1,1 difluoroethane is found in the blood."

The administrator of Monticelli's estate commenced the instant action seeking compensation for Monticelli's pain and suffering and wrongful death. Briefly stated, it is claimed that Wal-Mart negligently sold large quantities of CleanSafe.  It is further claimed that IQ knew that CleanSfae was commonly abused by individuals as an inhalant capable of producing psychoactive effects but failed to add sufficient quantities of deterrent or bittergent

to deter inhalant abuse.  Presently before the Court are Defendants' motions for summary

judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of the Complaint in its entirety.

## II.        STANDARD OF REVIEW

Defendants move for summary judgment pursuant to Rule 56.  It is well settled that,

on a motion for summary judgment, the Court must construe the evidence in the light most

favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir.

1999), and may grant summary judgment only where "there is no genuine issue as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  An issue is genuine if the relevant evidence is such that a reasonable jury could return

a verdict for the nonmoving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  A

party seeking summary judgment bears the burden of informing the court of the basis for the

motion and of identifying those portions of the record that the moving party believes

demonstrate the absence of a genuine issue of material fact as to a dispositive issue.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to establish a prima

facie basis for summary judgment, the burden of production shifts to the party opposing

summary judgment who must produce evidence establishing the existence of a factual

dispute that a reasonable jury could resolve in his favor.  Matsushita Elec. Indus. Co. v.

Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A party opposing a properly supported

motion for summary judgment may not rest upon "mere allegations or denials" asserted in his

pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on

conclusory allegations or unsubstantiated speculation.  Scotto v. Almenas, 143 F.3d 105,

114 (2d Cir. 1998).

With these standards in mind, the Court will address the pending motions.

- 4 -

## III.    DISCUSSION

Defendants move to dismiss on the grounds that this action is barred from recovery by the Barker/Manning doctrine because Monticelli was engaging in an illegal act (possessing and using cocaine) that contributed to his injuries and resulting death.  See Manning v. Brown, 91 N.Y.2d 116, 120 (1997); Barker v. Kallash, 63 N.Y.2d 19 (1984).

Where "a plaintiff has engaged in unlawful conduct, the courts will not entertain suit if the plaintiff's conduct constitutes a *serious* violation of the law and the injuries for which the plaintiff seeks recovery are the *direct* result of that violation."  Manning, 91 N.Y.2d at 120 (1997) (emphasis in original); see also Barker, 63 N.Y.2d 19.  "The policy derives from the rule that one may not profit from one's wrongdoing."  Manning, 91 N.Y.2d at 120.  Recovery is denied because New York State policy "generally denies judicial relief to those injured in the course of committing a serious criminal act."  Id.  Dismissal is not warranted "merely because the plaintiff's injuries were occasioned by a criminal act."  Id.  "Preclusion is required only where the plaintiff's injuries 'were a direct result of a serious violation of the law involving hazardous activities which were not justified under the circumstances.'"  Id. (quoting Barker, 63 N.Y.2d at 19).  Under this public policy, "a plaintiff cannot rely upon an *illegal act* or *relationship* to define the defendant's duty."  Alami v. Volkswagen of Am., 97 N.Y.2d 281, 287 (2002) (emphasis in original).  Thus, the doctrine applies to claims where the "parties to the suit were involved in the underlying criminal conduct, or where the criminal plaintiff seeks to impose a duty arising out of an illegal act."  Id.

The New York Court of Appeals has applied these principles on several occasions. In Reno v. D'Javid, 42 N.Y.2d 1040 (1977), the New York Court of Appeals affirmed the dismissal on public policy grounds of a personal injury claim by a woman against a doctor for

alleged negligence during the course of an unlawful abortion.  In <u>Barker</u>, 63 N.Y.2d 19, a fifteen year old was injured while constructing a pipe bomb.  The injured minor commenced a personal injury action against the nine year old defendant who sold the firecrackers from which plaintiff and his companions extracted the gunpowder to construct the bomb.  The Court held that principles of public policy would prohibit the plaintiff from recovering for injuries occasioned by his participation in a serious criminal act (constructing a bomb).  In <u>Manning</u>, 91 N.Y.2d 116, the New York Court of Appeals held that public policy precluded an action for injuries sustained in a car accident where the plaintiff was engaged in joyriding.

By contrast, in <u>Alami</u>, the Court held that public policy did not preclude a products liability claim against a vehicle manufacturer for injuries sustained from an automobile accident occasioned by the driver's intoxication.  In distinguishing the prior cases, the Court of Appeals held that "[i]f Volkswagen did defectively design the [car] as asserted by plaintiff's expert, it breached a duty to any driver of [the car] involved in a crash regardless of the initial cause."  97 N.Y.2d at 287.  Thus, the Court held, "[t]he duty [the plaintiff] seeks to impose on Volkswagen originates not from her husband's act, but from Volkswagen's obligation to design, manufacture and market a safe vehicle."  <u>Id.</u>  The Court endeavored to ensure that its holding was not over-read.  The Court continued:

> That same reasoning . . . would deny a burglar injured on a defective staircase from asserting a claim against his victim. . . .  Although landowners do have a general duty to the public to maintain their premises in a reasonably safe condition . . . this duty does not exist in the abstract.  It takes form when someone enters the premises and is injured.  Thus, the injured burglar is not entitled to benefit from his burglary because he cannot invoke a duty triggered by his unlawful entry.

<u>Id.</u> at 287-88.

Defendants seek to invoke the Barker/Manning doctrine because the facts show that Monticelli was using cocaine in and around the same time he was inhaling the Cleansafe shortly before his death.  Defendant points to the medical examiner's report which identifies combined cocaine and 1,1 dilfuoroethane as the cause of death.  Defendants further argue that the combined use of cocaine and Cleansafe increased the likelihood of death "as the combined presence of the two substances acted synergistically, increasing the probability of the fatal arrhythmia."  Defs.' Mot. at 8.  Plaintiff responds that there is a question of fact whether the cocaine use was causally related to, or a contributing factor of, Monticelli's death.  Plaintiff's expert, Lyle Hayes, notes that Monticellis' blood level of cocaine was in the range associated with recreational use and not in the range typically associated with overdose, whereas the blood level of 1,1 difluoroethane was "well within the reported range of levels in nine inhalation fatalities with no other drugs contributing and is certainly sufficient to cause death."

Plaintiff seeks to hold Defendant Wal-Mart liable for a breach of its "duty to make certain that large quantities of dangerous substances were not sold to the public at large, when it was obvious that these dangerous items were not being purchased for the manufacturer's intended use."  First Am. Compl. at ¶¶ 13, 16.  Plaintiff further alleges that "'Cleansafe' brand dust remover was commonly abused by individuals as an inhalant capable of producing psychoactive effects" and that Defendant IQW should have been aware of "the potential lethal consequences of foreseeable misuse of the product. . . ."  Id. at ¶ 53.  Plaintiff claims that Defendants furnished and supplied an environment "where the consumption of illegal drugs and toxic substances such as the 'Cleansafe' brand dust remove took place."  Id. at ¶ 55.

It is undisputed that Monticelli was using cocaine on the evening of his death. It, similarly, is undisputed that he was using the cocaine shortly before his death. Cocaine use constitutes a serious violation of the law. See People v. Varela, 121 Misc.2d 1051, 1056 (Sup. Ct. New York County) (selling cocaine is a serious offense); Matter of Kaufman,136 A.D.2d 192, 194 (1st Dep't 1988) (possession of cocaine is a serious offense constituting professional misconduct); People v. DiOrio, 99 A.D.2d 593, 594 (3d Dep't 1984) ("cocaine use has a serious adverse effect on our society"). It also is undisputed that Monticelli was inhaling 1,1 difluoroethane on the evening of his death. Based on the record before the Court, it cannot be said that Monticelli's death was caused by his engaging in criminal conduct (i.e., using of cocaine), or that Plaintiff seeks to impose a duty arising out of an illegal act. There mere fact that Monticelli was engaged in criminal conduct does not automatically preclude any and all recovery. Rather, the injuries must be related to the violation of law. Although application of the Barker/Manning doctrine is a legal issue, there are factual issues remaining concerning the extent to which the cocaine use contributed to (or did not contribute to) Monticelli's death. For the reasons to be explained, Monticelli may well have died regardless of any cocaine use, thereby rendering its use unrelated to the injuries he sustained and precluding application of the Barker/Manning doctrine.

Defendants' expert notes that the levels of 1,1 Difluoroethane in Monticelli's blood is "consistent with blood values . . . in . . . men 20-42 yr old who died due to excessive abuse of aerosols. . . ." This is consistent with the testimony of Plaintiff's expert. Defendants' expert further opines that "Mr. Monticelli's death is typical of 'Sudden Sniffing Death Syndrom' (SSDS) associated with the deliberate deep inhalation of volatiles and aerosol products. . . ." This, too, is consistent with the report from Plaintiff's expert. Defendants'

expert notes that "[the] massive transient hypoxia [caused by the deep inhalation of 1, 1 diluoroethane] <u>alone</u> may have caused a fatal arrhythmia." (emphasis added). Plaintiff's expert stated in his report that "[t]he fact that the cocaine level is not in the acute toxic range makes it difficult to attribute cause of death to cocaine overdose in the presence of other potentially fatal events or toxins. In the absence of clearly toxic levels of cocaine, i.e. much higher than those found here, cocaine is not certain to be a contributing factor in this death, in my opinion. This is the case here, since a fatal level of 1,1 difluoroethane is found in the blood."[2] Accordingly, there is ample evidence on the record that the amounts of 1,1,

Thomas J. McAvoy

Thomas J. McAvoy
Senior, U.S. District Judge

---

[2] Defendants argue that Dr. Hayes is not qualified to render an opinion on Monticelli's cause of death. Dr. Hayes is a New York State Certified Forensic Toxicologist with experience in drugs of abuse testing. He has a bachelor's degree in chemistry and a Ph.D. in biochemistry/biophysics. The Court finds that Dr. Hayes' background and experience as a toxicologist renders him qualified to testify

(continued...)

difluoroethan in Monticelli's blood was enough to cause death regardless of any cocaine use. Defendants' expert then opines that, based on studies demonstrating that high concentrations of fluorocarbons act synergistically with endogenous catecholamine to increase stimulation of the heart that may lead to cardiac arrest, the use of cocaine (which stimulates the heart) together with the 1, 1 dilfuoroethane "would have greatly increased the probability of fatal arrhythmia." Plaintiff's expert does not rule out the possibility that cocaine had some contributing effect. While it is possible that the cocaine use contributed to Monticelli's death, looking at the evidence in the light most favorable to the non-movant, it appears that Monticelli may have died from inhaling the CleanSafe alone and irrespective of any cocaine use.[3] The Court, therefore, finds that Defendants have failed to demonstrate an absence of a triable issue of fact whether Monticelli's injuries were related to his cocaine use.

Further, it cannot be said that Plaintiff seeks to impose a duty arising out of Monticelli's use of cocaine. The duties Plaintiff seeks to impose on Defendants (controlling the sale of CleanSafe in large quantities, controlling the sale of CleanSafe to persons believed to be using it for unintended purposes, and putting in additives to discourage inhalation) apply to anyone who may inhale products containing 1, 1 difluoroethane regardless of whether they are also illegally using controlled substances.

## IV.     CONCLUSION

---

[2](...continued)
concerning the levels of cocaine and/or 1,1 difluoroethane likely to cause or contribute to death.

[3] Neither party has argued that the inhalation of 1,1 difluoroethane is a serious violation of the law. Rather, it appears that New York views in the inhalation of hazardous inhalants as a relatively minor offense. See N.Y. Public Health Law § 3380(6) (providing for punishments ranging from 5 days imprisonment and a $50 fine and classification up to a class A misdemeanor).

For the foregoing reasons, Defendants' motions for summary judgment seeking dismissal of the claims under the Barker/Manning rule are DENIED without prejudice to the filing of motions for summary judgment on other legal grounds.  To the extent Defendant IQ seeks dismissal of Defendant Wal-Mart's cross-claims, that motion also is denied without prejudice as premature.

IT IS SO ORDERED.

Dated: August 21, 2013

Thomas J. McAvoy
Senior, U.S. District Judge